## BALDWIN *v.* FRANKS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

Submitted April 26, 1886. — Decided March 7, 1887.

Congress has power, under the Constitution, to provide for the punishment of persons guilty of depriving Chinese subjects of any of the rights, privileges, immunities, or exemptions guaranteed to them by the treaty

of November 17, 1880; but Congress has not made such provision in § 5519, Rev. Stat., nor in § 5508, nor in § 5336.

Section 5519, Rev. Stat., is unconstitutional as a provision for the punishment of a conspiracy, within a state, to deprive an alien of rights guaranteed to him therein by a treaty of the United States: whether it can be enforced in a territory, against persons conspiring there with that object, is not now decided.

*United States* v. *Reese*, 92 U. S. 214, affirmed, and applied to the facts in this case.

To give effect to the rule that when part of a statute is constitutional and part is unconstitutional, that which is constitutional will, if possible, be enforced, and that which is unconstitutional will be rejected, the two parts must be capable of separation, so that each can be read by itself; limitation by construction is not separation

*Packet Co.* v. *Keokuk*, 95 U. S. 80, and *Presser* v. *Illinois*, 116 U. S. 252, distinguished.

In describing the offence against a citizen of the United States for which punishment is provided by Rev. Stat. § 5508, the word "citizen" is used in its political sense, with the same meaning which it has in the Fourteenth Amendment to the Constitution; and not as being synonymous with "resident," "inhabitant," or "person."

To constitute the offence described in the first clause of Rev. Stat. § 5336, it is not enough that a law of the United States is violated, but there must be a forcible resistance to a positive assertion of their authority as a government.

To constitute an offence under the second clause of Rev. Stat. § 5336 there must be a forcible resistance to the authority of the United States while they are endeavoring to carry their laws into execution.

PETITION for writ of *habeas corpus*. The petitioner set forth that he was arrested by the defendant in error, United States Marshal for the District of California, under a warrant issued by a commissioner of the Circuit Court of the United States charging him with conspiring with others to deprive certain subjects of the Emperor of China "of the equal protection of the laws and of equal privileges and immunities under the laws." The petition set forth the warrant, describing the alleged illegal acts, and closed with this averment and prayer:

"And your petitioner claims and avers that the said commissioner of the said Circuit Court had no jurisdiction or authority to issue the said warrant, or to commit your said petitioner to the custody of the said United States Marshal, for the said offence alleged in the said complaint, nor has the said

Marshal any warrant or authority of law to confine your said petitioner or restrain him of his liberty, as aforesaid; that the offence charged in the said complaint, and for which the said warrant was issued, and for which your said petitioner is now being held in confinement, is one purely of state jurisdiction, and over which the Government of the United States and its tribunals have no jurisdiction whatsoever. That your petitioner is a citizen of the United States and of the state of California, and that said offence is alleged to have been committed in the county of Sutter and within the jurisdiction of said state; Wherefore, to be relieved of said unlawful detention and imprisonment, your petitioner prays that a writ of *habeas corpus*, to be directed to the said J. C. Franks, may issue in this behalf, so that your petitioner may be forthwith brought before this court to do, submit to, and receive what the law may require."

The court below refused the writ. The petitioner then sued out this writ of error.

*Mr. A. L. Hart* for plaintiff in error.

*Mr. Hall McAllister* for defendant in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a writ of error brought by Thomas Baldwin, the plaintiff in error, for the review of a judgment of the Circuit Court of the United States for the District of California refusing his discharge, on a writ of *habeas corpus*, from the custody of the marshal of the district, and the questions presented for consideration arise on a certificate of the judges, holding the court, of a division of opinion between them in the progress of the trial. The record shows that Baldwin was held in custody by the marshal, under a warrant issued by a commissioner of the Circuit Court, on a charge of conspiracy with Bird Wilson, William Hays, and others to deprive Sing Lee and others, belonging to "a class of Chinese aliens, being . . . subjects of the Emperor of China, of the equal protection of the laws and of equal privileges and immunities under the laws,

for that said . . . persons so belonging to the class of Chinese aliens did then . . . reside at the town of Nicolaus, in said county of Sutter, in said State of California, and were engaged in legitimate business and labor to earn a living, as they had a right to do, and they at that time had a right to reside at said town of Nicolaus, . . . and engage in legitimate business and labor to earn a living, under and by virtue of the treaties existing, and which did then exist, between the Government of the United States and the Emperor of China, and the Constitution and laws of the United States; but, nevertheless, while said . . . persons were . . . so residing and pursuing their legitimate business and labor for the purpose aforesaid, said conspirators . . . did, . . . having conspired together for that purpose, unlawfully and with force and arms, violently and with intimidation, drive and expel said persons, . . . belonging to said class of Chinese, . . . from their residence at said town of Nicolaus, . . . and did . . . deprive them . . . of the privilege of conducting their legitimate business and of the privilege of laboring to earn a living, and, without any legal process, . . . placed said Chinese aliens . . . under unlawful restraint and arrest, and so detained them for several hours, and . . . by force and arms, and with violence and intimidation, placed them . . . upon a steamboat barge, then plying on the Feather River, and drove them from their residence and labor and from said county."

The questions certified relate only to the sufficiency of this charge for the detention of the prisoner. There are nine questions in all, the first six having reference to § 5519 of the Revised Statutes, and the others to §§ 5508 and 5336, as the authority for the prosecution. The fourth fairly presents the whole case as it arises under § 5519, and that is as follows:

"4. Whether a conspiracy of two or more persons in the State of California, for the purpose of depriving Chinese residents, lawfully residing in California, in pursuance of the provisions of the several treaties between the United States and the Emperor of China, of the right to live and pursue their lawful vocations at the town of Nicolaus in said State,

and in pursuance of such conspiracy, actually, forcibly expelling such Chinese from said town, in the manner shown by the record, is: 1. A violation of and an offence within the meaning of §.5519 of the Revised Statutes of the United States. 2. Whether said section, so far as it applies to said state of facts and such Chinese residents, and makes the acts stated an offence against the United States, is constitutional and valid?"

The seventh presents all the points for consideration under §§ 5508 and 5336, as follows:

"7. Where two or more persons, with or without disguise, go upon the premises of Chinese subjects, lawfully residing in the State of California, with intent to prevent and hinder their free exercise or enjoyment of any right secured to them by the several treaties between the United States and the Emperor of China, and, in pursuance of such conspiracy, forcibly prevent their exercise and enjoyment of such rights, and expel such Chinese subjects from the town in which they reside:

"Whether (1) such acts so performed constitute an offence within the meaning of the provisions of § 5508 of the Revised Statutes of the United States? and,

"(2) If so, whether the provisions of said section, so making said acts an offence, are constitutional and valid?

"(3) Whether such acts so performed constitute an offence within the meaning of that clause of § 5336 of the Revised Statutes of the United States, which makes it an offence for two or more persons in any state to conspire, 'by force, to prevent, hinder, or delay the execution of any law of the United States,' or within the meaning of any other clause of said section? and,

"(4) Whether said section, so far as applicable to the facts stated, is a constitutional and valid law of the United States?"

The precise question we have to determine is not whether Congress has the constitutional authority to provide for the punishment of such an offence as that with which Baldwin is charged, but whether it has so done.

That the treaty-making power has been surrendered by the states and given to the United States, is unquestionable. It is

true, also, that the treaties made by the United States and in force are part of the supreme law of the land, and that they are as binding within the territorial limits of the states as they are elsewhere throughout the dominion of the United States.

Articles II and III of a treaty between the United States and the Emperor of China, concluded November 17, 1880, and proclaimed by the President of the United States, October 5, 1881, are as follows:

"ARTICLE II. Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities and exemptions which are accorded to the citizens and subjects of the most favored nation."

"ARTICLE III. If Chinese laborers or Chinese of any other class, now either permanently or temporarily residing in the territory of the United States, meet with ill treatment at the hands of any other persons, the Government of the United States will exert all its power to devise measures for their protection and to secure to them the same rights, privileges, immunities, and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by treaty." 22 Stat. 827.

That the United States have power under the Constitution to provide for the punishment of those who are guilty of depriving Chinese subjects of any of the rights, privileges, immunities, or exemptions guaranteed to them by this treaty, we do not doubt. What we have to decide, under the questions certified here from the court below, is, whether this has been done by the sections of the Revised Statutes specially referred to. These sections are as follows:

"SEC. 5519. If two or more persons in any state or territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection

of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any state or territory from giving or securing to all persons within such state or territory the equal protection of the laws; each of such persons shall be punished by a fine of not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, not less than six months nor more than six years, or by both such fine and imprisonment."

"SEC. 5508. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars, and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

"SEC. 5336. If two or more persons in any state or territory conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof; or by force to prevent, hinder, or delay the execution of any law of the United States; or by force to seize, take, or possess any property of the United States contrary to the authority thereof; each of them shall be punished by a fine of not less than five hundred dollars and not more than five thousand dollars; or by imprisonment, with or without hard labor, for a period not less than six months, nor more than six years, or by both such fine and imprisonment."

As the charge on which Baldwin is held in custody was evidently made under § 5519, and that is the section which was most considered in the court below, we will answer the questions based on that first. It provides for the punishment of those who "in any state or territory conspire . . . for

the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws."

In *United States* v. *Harris*, 106 U. S. 629, it was decided that this section was unconstitutional, as a provision for the punishment of conspiracies of the character therein mentioned, within a state. It is now said, however, that in that case the conspiracy charged was by persons in a state against a citizen of the United States and of the state, to deprive him of the protection he was entitled to under the laws of that state, no special rights or privileges arising under the Constitution, laws, or treaties of the United States being involved; and it is argued that, although the section be invalid so far as such an offence is concerned, it is good for the punishment of those who conspire to deprive aliens of the rights guaranteed to them in a state, by the treaties of the United States. In support of this argument reliance is had on the well settled rule that a statute may be in part constitutional and in part unconstitutional, and that under some circumstances the part which is constitutional will be enforced, and only that which is unconstitutional rejected. To give effect to this rule, however, the parts — that which is constitutional and that which is unconstitutional — must be capable of separation, so that each may be read by itself. This statute, considered as a statute punishing conspiracies in a state, is not of that character, for in that connection it has no parts within the meaning of the rule. Whether it is separable, so that it can be enforced in a territory, though not in a state, is quite another question, and one we are not now called on to decide. It provides in general terms for the punishment of all who conspire for the purpose of depriving any person, or any class of persons, of the equal protection of the laws, or of equal privileges or immunities under the laws. A single provision, which makes up the whole section, embraces those who conspire against citizens as well as those who conspire against aliens — those who conspire to deprive one of his rights under the laws of a state, and those who conspire to deprive him of his rights under the Constitution, laws, or treaties of the

United States. The limitation which is sought must be. made, if at all, by construction, not by separation. This, it has often been decided, is not enough.

Thus, in *United States* v. *Reese*, 92 U. S. 214, the indictment was against two of the inspectors of a municipal election in Kentucky, under §§ 3 and 4 of the act of May 31, 1870, c. 114, 16 Stat. 140, which provided in general terms for the punishment of inspectors who should wrongfully refuse to receive the vote of a citizen when presented under certain circumstances, and for the punishment of those who by unlawful means hindered or delayed any citizen from doing any act required to be done to qualify him to vote, or from voting at any election. There was nothing in either of the sections to limit their operation to a refusal or hindrance "on account of the race, color, or previous. condition of servitude" of the voter, and it was held that they were unconstitutional because, on their face, they were broad enough to cover wrongful acts without as well as within the constitutional power of Congress. An attempt was made there as here to limit the statute by construction, so as to make it operate only on that which Congress might rightfully prohibit and punish; but to this the court said, p. 221: "For this purpose we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question then to be determined is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only." This was answered in the negative, the court remarking: "To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one."

Following this were the *Trade-Mark Cases*, 100 U. S. 82, in

which there were indictments under §§ 4 and 5 of the act of August 14, 1876, c. 274, 19 Stat. 141, "to punish the counterfeiting of trade-mark goods and the sale or dealing in of counterfeit trade-mark goods." Of this act the court said, speaking through Mr. Justice Miller, p. 98, that its broad purpose "was to establish a universal system of trade-mark registration, for the benefit of all who had already used a trade-mark, or who wished to adopt one in the future, without regard to the character of the trade to which it was to be applied or the residence of the owner, with the solitary exception that those who resided in foreign countries which extended no such privileges to us were excluded from them here." A statute so broad and sweeping was then held not to be within the constitutional grant of legislative power to Congress, but p. 95, "whether the trademark bears such a relation to commerce in general terms as to bring it within congressional control, when used or applied to the classes of commerce which fall within that control," was properly left undecided. The indictment, however, presented a case in which the defendant was charged with having in his possession counterfeits and colorable imitations of the trade-marks of foreign manufacturers, and it was suggested that if Congress had power to regulate trade-marks used in commerce with foreign nations and among the several States, this statute might be held valid in that class of cases, if no further; but the court decided otherwise, and in so doing said, p. 98: "While it may be true that when one part of a statute is valid and constitutional, and another part is unconstitutional and void, the court may enforce the valid part, where they are distinctly separable, so that each can stand alone, it is not within the judicial province to give to the words used by Congress a narrower meaning than they are manifestly intended to bear, in order that crimes may be punished which are not described in language that brings them within the constitutional power of that body." And again, further on, after citing *United States* v. *Reese,* and quoting from the opinion in that case, it was said, p. 99: "If we should, in the case before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable we should do what,

if the matter were now before that body, it would be unwilling to do; namely, make a trade-mark law which is only partial in its operation, and which would complicate the rights which parties would hold, in some instances under the act of Congress, and in others under State law."

The same question was also considered and the former decisions approved in *United States* v. *Harris, supra;* and in the *Virginia Coupon Cases*, 114 U. S. 269, 305, it was said that "to hold otherwise would be to substitute for the law intended by the legislature one they may never have been willing by itself to enact."

It is suggested, however, that *Packet Co.* v. *Keokuk*, 95 U. S. 80, and *Presser* v. *Illinois*, 116 U. S. 252, are inconsistent with *United States* v. *Reese* and the *Trade-Mark Cases;* but we do not so understand them. In *Packet Co.* v. *Keokuk*, the question arose upon an ordinance of the city of Keokuk establishing a wharf on the Mississippi River and the rates of wharfage to be paid for its use. In its general scope the ordinance was broad enough to include a part of the shore of the river declared to be a wharf, which was in its natural condition and unimproved. The city had, however, actually built, paved, and improved a wharf at a large expense within the limits of the ordinance, and the charges then in question were for the use of the facilities thus provided for receiving and discharging cargoes. An objection was made to the validity of the ordinance, because it provided for charges to be paid for the use of the unimproved bank as well as for the improved wharves, but the court said, p. 89: "The ordinance of Keokuk has imposed no charge upon these plaintiffs which it was beyond the power of the city to impose. To the extent to which they are affected by it there is no valid objection to it. Statutes that are constitutional in part only will be upheld so far as they are not in conflict with the Constitution, provided the allowed and prohibited parts are severable. We think a severance is possible in this case. It may be conceded that the ordinance is too broad, and that some of its provisions are unwarranted. When those provisions are attempted to be enforced, a different question may be presented." That was

not a penal statute, but only a city ordinance regulating wharf-age, and the suit was civil in its nature. The only question was whether the packet company was bound to pay for the use of improved wharves when the ordinance, taken in its breadth, fixed the charges and required payment for the use of that part of the established wharf which was unimproved as well as that which was improved. The precise point to be determined was whether, under those circumstances, the vessel owners were excused from paying for the use of that which was improved.

In *Presser* v. *Illinois*, the indictment was for a violation of the provisions of one of the sections of the Military Code of Illinois, and it was claimed that the whole code was invalid, because in its general scope and effect it was in conflict with Title XVI of the Revised Statutes of the United States upon the subject of "The Militia." But the court held that, even if the first two sections of the code, on which the objection rested, were invalid, they were easily separable from the rest which could be maintained. The objectionable sections related to the enrolment of the militia in the state generally, and the rest to the organization of eight thousand men as a "volunteer active militia." This evidently brought that case within the rule which controls the determination of this class of questions, that the constitutional part of a statute may be enforced and the unconstitutional part rejected, "where the parts are so distinctly separable that each can stand alone, and where the court is able to see and to declare that the intention of the legislature was that the part pronounced valid should be enforcible, even though the other part should fail." *Virginia Coupon Cases*, 114 U. S. at p. 305. As was said in *Louisiana* v. *Allen*, 103 U. S. 80, 84: "The point to be determined in all such cases is whether the unconstitutional provisions are so connected with the general scope of the law as to make it impossible, if they are stricken out, to give effect to what appears to have been the intent of the legislature."

Applying this rule to the present case, it is clear that § 5519 cannot be sustained in whole or in part in its operation within a state, unless *United States* v. *Harris* is overruled, and this

we see no occasion for doing. That case was carefully considered at the time, and subsequent reflection has not changed our opinion as then expressed. For this reason we answer the second branch of the fourth question, which has been certified, in the negative. This disposes of all the other points included in the first six questions, and no further answer to them is necessary.

We come now to the questions certified, which arise under § 5508. That this section is constitutional was decided in *Ex parte Yarbrough*, 110 U. S. 651, and *United States* v. *Waddell*, 112 U. S. 76. The real question to be determined, therefore, is, whether what is charged to have been done by Baldwin constitutes an offence within the meaning of its provisions.

The section is found in Title LXX, c. 7, of the Revised Statutes embracing "Crimes against the Elective Franchise and Civil Rights of Citizens," and it provides for the punishment of those " who conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having exercised the same ; " and of those who go in companies of two or more " in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured." The person on whom the wrong to be punishable must be inflicted is described as a *citizen.* In the Constitution and laws of the United States the word " citizen " is generally, if not always, used in a political sense to designate one who has the rights and privileges of a citizen of a state or of the United States. It is so used in section 1 of Article XIV of the amendments of the Constitution, which provides that " all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside," and that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." But it is also sometimes used in popular language to indicate the same thing as resident, inhabitant, or person. That it is not so used in § 5508 in the Revised Statutes is quite

clear, if we revert to the original statute from which this section was taken. That statute was the act of May 31, 1870, c. 114, 16 Stat. 140, "to enforce the Right of Citizens of the United States to vote in the several States of this Union, and for other purposes." It is the statute which was under consideration as to some of its sections in. *United States* v. *Reese, supra,* and from its title, as well as its text, it is apparent that the great purpose of Congress in its enactment was to enforce the political rights of citizens of the United States in the several states. Under these circumstances there cannot be a doubt that originally the word "citizen" was used in its political sense, and as the Revised Statutes are but a revision and consolidation of the statutes in force December 1, 1873, the presumption is that the word has the same meaning there that it had originally.

This particular section is a substantial re-enactment of § 6 of the original act, which is found among the sections that deal exclusively with the political rights of citizens, especially their right to vote, and were evidently intended to prevent discriminations in this particular against voters on account "of race, color, or previous condition of servitude." Sometimes, as in §§ 3 and 4, the language is broader than this, and therefore, as decided in *United States* v. *Reese,* those sections are inoperative, but still it is everywhere apparent that Congress had it in mind to legislate for citizens, as citizens, and not as mere persons, residents or inhabitants.

This section is highly penal in its character, much more so than any others, for it not only provides as a punishment for the offence a fine of not more than five thousand dollars and an imprisonment of not more than ten years, but it declares that any person convicted shall "be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States." It is, therefore, to be construed strictly; not so strictly as to defeat the legislative will, but doubtful words are not to be extended beyond their natural meaning in the connection in which they are used. Here the doubtful word is "citizen," and it is used in connection with the rights and privileges pertaining to a man as a citizen,

and not as a person only or an inhabitant. And, besides, the crime has been classified in the revision among those which relate to the elective franchise and the civil rights of citizens. For these reasons we are satisfied that the word "citizen," as used in this statute, must be given the same meaning it has in the Fourteenth Amendment of the Constitution, and that to constitute the offence which is there provided for, the wrong must be done to one who is a citizen in that sense.

It is true that the word "citizen" only occurs in the first clause of the section, but in the second clause there is nothing to indicate that any other than a citizen was meant, and the section of the original statute from which this was taken has nothing from which any different inference can be drawn. That clearly deals with citizens alone, and the revision differs from it only in a re-arrangement of the original sentences and the exclusion of some superfluous words. Sections 5506 and 5507, which immediately precede this in the revision, clearly refer to political rights only, for they both relate to the privilege of voting, § 5506 being for the protection of citizens in terms, and § 5507 being for the protection of those to whom the right of suffrage is guaranteed by the Fifteenth Amendment of the Constitution. It may be that by this construction of the statute some are excluded from the protection it affords who are as much entitled to it as those who are included ; but that is a defect, if it exists, which can be cured by Congress, but not by the courts.

We therefore answer the first subdivision of the seventh question certified in the negative. The second subdivision need not be answered otherwise than it has been elsewhere in this opinion.

It remains only to consider that part of the questions certified which relates to § 5336. That section provides for the punishment of those who conspire, 1, "to overthrow, put down, or destroy by force the government of the United States, or to levy war against them, or to oppose by force the authority thereof;" or, 2, "by force to prevent, hinder, or delay the execution of any law of the United States;" or, 3, "by force to seize, take, or possess any property of the United States con-

trary to the authority thereof." This is a re-enactment of similar provisions in the act of July 31, 1861, c. 33, 12 Stat. 284, "to define and punish certain Conspiracies," and in that of April 20, 1871, c. 22, § 2, 17 Stat. 13, "to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."

It cannot be claimed that Baldwin has been charged with a conspiracy to overthrow the government or to levy war within the meaning of this section. Nor is he charged with any attempt to seize the property of the United States. All, therefore, depends on that part of the section which provides a punishment for "opposing" by force the authority of the United States, or for preventing, hindering, or delaying the "execution" of any law of the United States.

This evidently implies force against the government as a government. To constitute an offence under the first clause, the authority of the government must be opposed; that is to say, force must be brought to resist some positive assertion of authority by the government. A mere violation of law is not enough; there must be an attempt to prevent the actual exercise of authority. That is not pretended in this case. The force was exerted in opposition to a class of persons who had the right to look to the government for protection against such wrongs, not in opposition to the government while actually engaged in an attempt to afford that protection.

So, too, as to the second clause, the offence consists in preventing, hindering, or delaying the government of the United States in the execution of its laws. This, as well as the other, means something more than setting the laws themselves at defiance. There must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution. The United States are bound by their treaty with China to exert their power to devise measures to secure the subjects of that government lawfully residing within the territory of the United States against ill treatment, and if in their efforts to carry the treaty into effect they had been forcibly opposed by persons who had conspired for that purpose, a state of things contemplated by the statute would have

arisen. But that is not what Baldwin has done. His conspiracy is for the ill treatment itself, and not for hindering or delaying the United States in the execution of their measures to prevent it. His force was exerted against the Chinese people, and not against the government in its efforts to protect them. We are compelled, therefore, to answer the third subdivision of the seventh question in the negative, and that covers the fourth subdivision.

This disposes of the whole case, and, without answering the questions certified more in detail,

*We reverse the judgment of the Circuit Court, and remand the case for further proceedings not inconsistent with this opinion.*

Mr. Justice Harlan dissenting.

By the treaty of 1880–1881, with China, the Government of the United States agreed to exert all its power to devise measures for the protection, against ill treatment at the hands of other persons, of Chinese laborers or Chinese of any other class, permanently or temporarily residing, at the time, in this country, and to secure to them the same rights, privileges, immunities and exemptions to which the citizens or subjects of the most favored nation are entitled, by treaty, to enjoy here. It would seem from the decision in this case, that if Chinamen, having a right, under the treaty, to remain in our country, are forcibly driven from their places of business, the Government of the United States is without power, in its own courts, to protect them against such violence, or to punish those who, in this way, subject them to ill treatment. If this be so, as to Chinamen lawfully in the United States, it must be equally true as to the citizens or subjects of every other foreign nation, residing or doing business here under the sanction of treaties with their respective governments.

I do not think that such is the present state of the law, and must dissent from the opinion and judgment of the court.

It is conceded in the opinion of the court to be within the constitutional power of Congress to provide — as by § 5508 of

the Revised Statutes it has done — that "if two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or: if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined," &c. It is also conceded that, in the meaning of that section, a treaty between this Government and a foreign nation is a "law" of the United States; and that the wrongs done by Baldwin and others to the subjects of the Emperor of China, named in the warrant, prevented the free exercise and enjoyment of rights and privileges secured to those aliens by the treaty between the United States and China. I concur in these views, but am unable to assent to the proposition that the offence charged is not embraced by the foregoing section or by any other valid enactment of Congress.

My brethren hold that § 5508 describes only wrongs done to a "citizen;" in other words, that Congress did not intend, by that section, to protect the free exercise or enjoyment of rights secured by the Constitution or laws of the United States, except where citizens are concerned. This, it seems to me, is an interpretation of the statute which its language neither demands nor justifies. Observe, that the subject with which Congress was dealing was the protection of "*any* right or privilege" secured by the Constitution or laws of the United States. There is, perhaps, plausible ground for holding that the first clause of § 5508 embraces only a *conspiracy* directed against a "citizen." But the succeeding clause describes two other and distinct offences, namely, the going of two or more persons "in disguise on the highway," and the going of two or more persons "on the *premises* of another" — that is, upon the premises of another *person* — with intent, in either case, to prevent or hinder the free exercise or enjoyment by such person of any right or privilege secured to him by the Constitution or laws of the United States. The use of the word

"another," instead of "citizen," in the latter clause, shows that, in respect of rights and privileges so secured, Congress had in mind the protection of persons, whether citizens or not. In this view, the statute is not unlike the Fourteenth Amendment, the first section of which recognizes as well rights appertaining to citizenship as rights belonging to persons. Baldwin and others, according to the statements in the warrant, certainly did go "on the premises of another," with the intent to interfere with rights which the court concede are secured by treaty, and, therefore, by the supreme law of the land. *Chew Heong* v. *United States*, 112 U. S. 536, 540; *Head Money Cases*, 112 U. S. 580. In my judgment the case is within both the letter and spirit of the statute. It is, however, excepted by the court from its operation by imputing to Congress the purpose of withholding national protection from those who do not happen to enjoy the privileges of American citizenship, — a purpose inconsistent with the obligations which the nation has assumed by treaties with other countries. I cannot think it possible that Congress, while providing for the punishment of two or more persons, who go on the *premises* of a citizen, with intent to prevent his free exercise or enjoyment of rights secured by the Constitution or laws of the United States, purposely refrained from providing for the punishment of the same persons going on the premises of one, not a citizen, with intent to prevent the enjoyment by the latter of rights secured by the same Constitution and laws.

The rule of interpretation which the court lays down, if applied in other cases, will lead to strange results. We have statutes which give "to every person who is the head of a family, or who has arrived at the age of twenty-one years, and is a citizen of the United States, or who has filed his declaration of intention to become such, as required by the naturalization laws," &c., Rev. Stat. §§ 2289, 2290, and 2291, the right, for purposes of a homestead, and under certain conditions, to enter unappropriated public lands. The party making the entry, or, if he be dead, his widow, &c., will be entitled ultimately to receive a patent, provided he resides upon and cultivates the land for a certain length of time, and provided, in

the case of the foreigner, he shall have become a citizen of the United States prior to his application for a patent. Now, suppose that an entry is made, under the homestead statute, by a citizen, and a similar entry is made at the same time, in the same locality, by one who has only filed his declaration of intention to become a citizen. During the period of residence upon and cultivation of the lands both of the parties so making entries are, we will suppose, forcibly driven from the land by a lawless band of persons, with the intent to prevent them from perfecting their respective rights to a patent. In the case of the citizen thus wronged, we held in *United States* v. *Waddell*, 112 U. S. 76, that he may invoke the protection given by § 5508, and in that way have the wrong-doers punished in a court of the United States as therein prescribed. But in the case of the person who has only declared his intention to become a citizen, the wrong-doers cannot be reached by indictment in a court of the United States, because, under the decision in this case, that section only furnishes protection to *citizens*.

It is said — though I believe no such suggestion is made by the court — that the words "if two or more persons go in disguise on the highway, or on the premises of another," apply only when the offenders are "in disguise." I cannot suppose that Congress intended to make a distinction between wrong-doers going in disguise "on the premises of another," for the purpose of interfering with rights secured by the Constitution or laws of the United States, and wrong-doers who openly and without masks enter upon the same premises with a like unlawful purpose. It intended, rather, to guard the homes of all persons against invasion by combinations of lawless men, who seek, by entering those homes, to prevent the free exercise of rights secured by the Constitution or laws of the United States. If the clause had read, "if two or more persons go on the highway in disguise, or on the premises of another," it would never occur to any one that the words "on the premises of another" were qualified by the words "in disguise." The free exercise of personal rights secured by the United States should not be made to depend upon the trifling circumstance that the

words "in disguise" precede, rather than follow, the words "on the highway."

In my judgment the going of two or more persons, whether openly or in disguise, on the premises of another, whether the latter be a citizen or not, with intent to prevent his free exercise or enjoyment of a right secured by the Constitution or laws of the United States, was made by § 5508 an offence against the United States.

I feel obliged also to express my non-concurrence in so much of the opinion of the court as holds that Congress is without power under the Constitution to make it—as by § 5519 of the Revised Statutes it is made — an offence against the United States for two or more persons, in any state, "to conspire, or go in disguise on the highway, or on the premises of another, for the purpose of depriving, directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any state . . . from giving or securing to all persons within such state . . . the equal protection of the laws."

It is not necessary, in this case, to inquire what is the full scope of that clause of the Fourteenth Article of Amendment, which provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." It is sufficient to say, that that provision does something more than prescribe the duty and limit the power of the states. Taken in connection with the fifth section, conferring upon Congress power to enforce the Amendment by appropriate legislation, that provision is equivalent to a declaration, in affirmative language, that every *person* within the jurisdiction of a state has a right to the equal protection of the laws; just as the prohibition in the Thirteenth Amendment, against the existence of slavery, operated not only to annul state laws upholding that institution, but to establish "universal civil and political freedom throughout the United States," and to invest every individual person within their jurisdiction with the right of freedom, *Civil Rights Cases,* 109 U. S. 3, 20; and just as the prohibition in the Fifteenth Amendment, against

the denial or abridgment of the right of citizens of the United States to vote, on account of their race, color, or previous condition of servitude, operated to invest such citizens with "a new constitutional right," which "comes from the United States," namely, "exemption from discrimination in the exercise of the elective franchise, on account of race, color, or previous condition of servitude." *United States* v. *Cruikshank,* 92 U. S. 542; *United States* v. *Reese,* 92 U. S. 214.

In the *Civil Rights Cases,* p. 23, above cited, it was held that Congress, under its express power to enforce, by appropriate legislation, the provisions of the Thirteenth Amendment, could, so far as necessary or proper, enact legislation, "direct and primary, operating upon the acts of individuals, whether sanctioned by state legislation or not," for the purpose of eradicating "all forms and incidents of slavery and involuntary servitude." And since, in the matter of voting, the exemption of citizens from discrimination on account of race, color, or previous condition of servitude is a right which "comes from the United States," and is "granted or secured by the United States," *United States* v. *Cruikshank* above cited, can it be doubted that Congress, under its express power to enforce the Fifteenth Amendment, by appropriate legislation, could make it an offence against the United States for two or more persons to conspire to deny or abridge the citizen's right to vote, on account of his race or color? Is there any recognized exception to the general rule that Congress may, by appropriate legislation, secure and protect rights derived from or guaranteed by the Constitution or laws of the United States? Believing that these questions must be answered in the negative, I am unable to perceive any constitutional objection to § 5519; certainly, none of such a serious character as to justify this court in holding that Congress, by enacting it, has transcended its powers. If the United States is powerless to secure the equal protection of the laws to persons within the jurisdiction of a state, until the state, by hostile legislation, or by the action of her judicial authorities, shall have denied such protection, and can even then interfere only through the courts of the Union in suits involving either the validity of such state

legislation, or the action of the state authorities, it is difficult to understand why Congress was invested with power, by appropriate legislation, to enforce the provisions of the Fourteenth Amendment; for, without such power of legislation, the courts of the Union are competent to annul any state laws or reverse any action of state judicial officers, which deny the equal protection of the laws to any particular person or class of persons. Indeed, since the organization of the government, there has existed a remedy in the courts of the Union for any denial, in a state court, of rights, privileges, or immunities derived from the United States. It seems to me that the main purpose of giving Congress power to enforce, by *legislation*, the provisions of the Amendment was, that the rights therein granted or guaranteed might be guarded and protected against lawless combinations of individuals, acting without the direct sanction of the state. The denial by the state of the equal protection of the laws to persons within its jurisdiction may arise as well from the failure or inability of the state authorities to give that protection, as from unfriendly enactments. If Congress, upon looking over the whole ground, determined that an effectual and appropriate mode to secure such protection was to proceed directly against combinations of individuals, who sought, by conspiracy or by violent means, to defeat the enjoyment of the right given by the Constitution, I do not see upon what ground the courts can question the validity of legislation to that end.

There is another view of this question which seems to be important. In *United States* v. *Waddell*, 112 U. S. 76, and again in this case, the court has sustained the power of Congress to enact § 5508, which, among other things, makes it an offence against the United States for two or more persons to "go in disguise on the highway, or on the premises of another," with intent to prevent or hinder his free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the United States. Now, it is difficult to understand why, if Congress can do this, it may not make it an offence for the same persons (§ 5519) to "go in disguise on the highway, or on the premises of another, for the purpose

of depriving, directly or indirectly, any person or class of persons, of the equal protection of the laws." The only possible answer to this suggestion is to say that "the equal protection of the laws" is not a right or privilege secured by the Constitution of the United States. But that, it seems to me, cannot be said, without doing violence to the language of that instrument, and defeating the intention with which the people adopted it.

It was long since announced by this court that "Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution." *United States* v. *Fisher*, 2 Cranch, 358. And in *McCulloch* v. *Maryland*, 4 Wheat. 361, 421, Chief Justice Marshall, speaking for the court, said : "The sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people." In view of these settled doctrines of constitutional law, I am unwilling to say that it is not appropriate legislation for the enforcement of the right, given by the Constitution, to the equal protection of the laws, for Congress to make it an offence against the United States, punishable by fine and imprisonment, for two or more persons in any state to conspire, or go in disguise on the highway, or go on the premises of another, for the purpose of depriving him of the equal protection of the laws.

Mr. Justice Field dissenting.

I agree with the majority of the court in its construction of the different sections of the Revised Statutes which have been under consideration in this case, except the third clause of § 5336, and the last clause of § 5508.

The third clause of § 5336 declares that if two or more persons in any state or territory conspire "by force to prevent, hinder, or delay the execution of any law of the United

States," each of them shall be punished by a fine of not less than $500 or more than $5,000, or by imprisonment, with or without hard labor, for a period of not less than six months or more than six years; or by both such fine and imprisonment.

By the treaty with China of 1868 the United States recognize the right of Chinese to emigrate to this country, and declare that in the United States the subjects of that empire shall enjoy the same privileges and immunities in respect to residence which are enjoyed by citizens or subjects of the most favored nation.

The complaint against the plaintiff in error is, that he conspired with others to expel by force from the town of Nicolaus, and the county of Sutter, in the State of California, the subjects of the Emperor of China, who were residing and doing business there, and in furtherance of the conspiracy entered the homes of certain persons of that class, seized them, and forcibly placed them upon a barge on Feather River, on the bank of which the town of Nicolaus is situated, and drove them from the county, and thus deprived them of privileges and immunities conferred by the treaty.

For this alleged offence the plaintiff in error, with others, was arrested. On application for a *habeas corpus* for his discharge, the judges of the Circuit Court were divided in opinion. This court holds that a conspiracy thus violently to expel the Chinese from the county and town where they resided and did business, and thus defeat the provisions of the treaty, was not a conspiracy to prevent or hinder by force the execution of a law of the United States, although a treaty is declared by the Constitution to be the supreme law of the land.

Under the Constitution, a treaty between the United States and a foreign nation is to be considered in two aspects — as a compact between the two nations, and as a law of our country. As a compact, it depends for its enforcement on the good faith of the contracting parties, and to carry into effect some of its provisions may require legislation. For any infraction of its stipulations importing a contract, the courts can afford no redress except as provided by such legislation. The matter is one to be settled by negotiation between the executive depart-

ments of the two governments, each government being at lib-
erty to take such measures for redress as it may deem advisa-
ble. *Foster* v. *Neilson*, 2 Pet. 253, 314; *Head Money Cases,*
112 U. S. 580, 598; *Taylor* v. *Morton*, 2 Curtis, 454, 459; *In
re Ah Lung*, 9 Sawyer, 306; *S. C.* 18 Fed. Rep. 28.

But in many instances a treaty operates by its own force,
that is, without the aid of any legislative enactment; and such
is generally the case when it declares the rights and privileges
which the citizens or subjects of each nation may enjoy in the
country of the other. This was so with the clause in some of
our early treaties with European nations, declaring that their
subjects might dispose of lands held by them in the United
States, and that their heirs might inherit such property, or the
proceeds thereof, notwithstanding their alienage. Thus the
treaty with Great Britain of 1794 provided that British sub-
jects then holding lands in the United States, and American
citizens holding lands in the dominions of Great Britain, should
continue to hold them according to the nature and tenure of
their respective estates and titles therein, and might grant, sell,
or devise the same to whom they pleased, in like manner as if
they were natives, and that neither they nor their heirs nor
assigns should, as far as might respect the said lands, and the
legal remedies incident thereto, be regarded as aliens. Art. 9,
8 Stat. 122. A clause to the same purport, and embracing also
movable property, was in the treaty with France of 1778, art.
11, 8 Stat. 18, and also in that of 1800, art. 7, 8 Stat. 182. It
required no legislation to give force to this provision. It was
the law of the land by virtue of the Constitution, and congres-
sional legislation could not add to its efficacy. Whenever in-
voked by the alien heirs, the rights it conferred were enforced
by the Federal courts. *Chirac* v. *Chirac*, 2 Wheat. 259; *Car-
neal* v. *Banks*, 10 Wheat. 181; *Hughes* v. *Edwards*, 9 Wheat.
489, 496. See also the Treaty with the Swiss Confederation of
1850, art. 5, 11 Stat. 590; *Hauenstine* v. *Lynham*, 100 U. S. 483.

This is so also with clauses, found in some treaties with for-
eign nations, stipulating that the subjects or citizens of those
nations may trade with the United States, and, for that pur-
pose, freely enter our ports with their ships and cargoes, and

reside and do business here. Thus the treaty of commerce with Italy of February 26, 1871, provides that "Italian citizens in the United States, and citizens of the United States in Italy, shall mutually have liberty to enter, with their ships and cargoes, all the ports of the United States and of Italy respectively, which may be open to foreign commerce. They shall also have liberty to sojourn and reside in all parts whatever of said territories." Art. 1, 17 Stat. 845. These stipulations operate by their own force; that is, they require no legislative action for their enforcement. Treaty of commerce with Great Britain of 1815, art. 1, 8 Stat. 228; renewed and continued for ten years by art. 4 of the treaty of 1818, 8 Stat. 249; and continued indefinitely by art. 1 of the treaty of 1827, 8 Stat. 361; treaty with Bolivia of May 13, 1838, art. 3, 12 Stat. 1009; treaty with Costa Rica of July 10, 1851, art. 2, 10 Stat. 917; treaty with Greece of December, 1837, art. 1, 8 Stat. 498; treaty with Sweden and Norway of July 4, 1827, art. 1, 8 Stat. 346.

The right or privilege being conferred by the treaty, parties seeking to enjoy it take whatever steps are necessary to carry the provisions into effect. Those who wish to engage in commerce enter our ports with their ships and cargoes; those who wish to reside here select their places of residence, no congressional legislation being required to provide that they shall enjoy the rights and privileges stipulated. All that they can ask, and all that is needed, is such legislation as may be necessary to protect them in such enjoyment. That they have, I think, to some extent, in the clause punishing any conspiracy to prevent or hinder by force the execution of a law of the United States. The section in which this clause appears is a reënactment in part of the act of July 31, 1861, and declares, among other things, a conspiracy of two or more persons to overthrow by force the Government of the United States, or to oppose by force its authority, or "by force to prevent, hinder, or delay the execution of *any* law of the United States," or by force to seize and possess any of their property against their authority, to be a high crime, and prescribes for it severe punishment. As thus seen, the section is not intended as a

protection against isolated or occasional acts of individual personal violence. For such offences the laws of the states make ample provision. It is intended to reach *conspiracies* against the supremacy and authority of the Government of the United States, and against the enforcement of its laws. It is directed not only against those who conspire to overthrow the government, but those also who conspire to defeat the execution of its laws, including under the latter treaties as well as statutes, and thus permanently deprive others of the rights, benefits, and protection intended to be conferred by such laws. In the case before us, the purpose of the alleged conspirators was to permanently deprive the Chinese residing in Nicolaus — not any particular Chinese, but all of that class of persons — of the right of residence conferred by the treaty. That right is not limited to any particular place; it may be exercised wherever it is lawful for any one to reside without encroachment upon the equal right of others. The conspirators well knew, as every one in California knows, the provision of the treaty and its meaning, and their purpose was to nullify and defeat it.

A treaty, in conferring a right of residence, requires no congressional legislation for the enforcement of that right; the treaty in that particular is executed by the intended beneficiaries. They select their residence. They are not required, as said above, to reside in any particular place, or do business there. A conspiracy to prevent by force a residence in the town or county selected by them appears to me, therefore, to be a conspiracy to prevent the operation — that is, the execution — of a law of the United States, and to be within the letter and spirit of the third clause of § 5336. If the conspirators can expel the Chinese from their residence in the town and county of their selection without being amenable to any law of the United States, they can, with like exemption from legal liability, expel the Chinese from the entire state, and thus utterly defeat the stipulations of the treaty.

So, also, a conspiracy to prevent by force ships belonging to subjects of a foreign nation — not any particular ship, but ships generally belonging to them — from entering our ports with their cargoes would, in my judgment, be a conspiracy to pre-

vent by force the operation of the treaty with that nation, which stipulates that its subjects shall have that privilege. And in all other cases where a clause of a treaty conferring rights or privileges operates by its own terms and does not require congressional legislation to give it effect, a conspiracy to prevent by force their enjoyment is a conspiracy to prevent by force the execution of a law of the United States; that is, to prevent its having, with respect to the rights and privileges stipulated, any effectual operation. I do not see how Congress could improve the matter, or do more than it has already done, by declaring that those who thus conspire by force to deprive parties of the rights or privileges conferred by a treaty should be punished. Its declaration to that effect would be no more than what the present law provides.

The last clause of § 5508 declares that "if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder the free exercise or enjoyment of any right or privilege so secured, [by the Constitution or laws of the United States,] they shall be fined not more than five thousand dollars, and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office or place of honor, profit, or trust created by the Constitution or laws of the United States."

I do not agree with the majority of the court that this clause is limited in its application only to offences against citizens. The first clause of the section is thus limited, but, in my judgment, the last is more extensive, and reaches an invasion of the premises of any one, whether citizen or alien, by two or more persons for the unlawful purposes mentioned. But I am not clear that the qualification of going "in disguise" on the highway does not also extend to the going on the premises of another — and thus render the clause inapplicable to the case before the court; though there is much force in the view of Mr. Justice Harlan, that the clause should be read as though its words were: "If two or more persons go on the highway in disguise, or on the premises of another, with the intent," &c., thus making the words "in disguise" apply only to the offence on the highway. If his view be correct, the last pro-

vision of the clause would describe the exact offence charged against the plaintiff in error and his co-conspirators — that they went on the premises of the Chinese with the intent to deprive them of rights and privileges conferred by the treaty — the law of the land — an intent which they carried out by forcibly expelling the Chinese from the town and county of their residence and business. But without adopting or rejecting his view, I prefer to place my dissent upon what I deem the erroneous construction by the court of the third clause of § 5336, in holding that it does not cover this case, but applies only to cases where there has been a forcible resistance to measures adopted by Congress for the execution of a law, or a treaty of the United States.

The result of the decision is, that there is no national law which can be invoked for the protection of the subjects of China in their right to reside and do business in this country, notwithstanding the language of the treaty with that empire. And the same result must follow with reference to similar rights and privileges of the subjects or citizens resident in this country or any other nation with which we have a treaty with like stipulations. Their only protection against any forcible resistance to the execution of these stipulations in their favor is to be found in the laws of the different states. Such a result is one to be deplored.