## ANDERSON et al. v. UNITED STATES. *

(Circuit Court of Appeals, Ninth Circuit. October 18, 1920. Rehearing Denied January 17, 1921.)

1. **Conspiracy 43(11)—Indictment for seditious conspiracy sufficient.**

    An indictment under Penal Code, § 6 (Comp. St. § 10170), for conspiracy to oppose by force the authority of the United States and by force to prevent, hinder, and delay the execution of its laws, *held* good where it charged a conspiracy between defendants and others as members, officers, and agents of the I. W. W. organization to advocate and encourage resistance to all laws, especially those enacted in furtherance of the prosecution of the war against Germany; that in carrying out such conspiracy defendants circulated newspapers and printed matter of the organization advocating sabotage and "slowing down" by workers, resistance to the execution of the Selective Draft Act, and finally the forcible revolutionary overthrow of all existing governmental authority in the United States; that one of the defendants, pursuant to said conspiracy, caused dynamite to be transported by a common carrier marked "glassware," in violation of law.

2. **Conspiracy 43(8)—To intimidate and oppress citizens held sufficient.**

    An indictment, under Penal Code, § 19 (Comp. St. § 10183), charging defendants with conspiracy to intimidate and oppress citizens in the exercise of their rights, and that in pursuance of such conspiracy they threatened and intimidated persons to prevent them from furnishing munitions, ships, and supplies to the government for war purposes under sales, orders, and contracts, *held* sufficient.

3. **Conspiracy 43(11)—Indictment for conspiracy to violate Selective Service Act sufficient.**

    An indictment under Penal Code, §§ 37, 332 (Comp. St. §§ 10201, 10506), for conspiracy to violate Selective Service Act, § 5 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044e), by inducing and aiding persons subject to the act in refusing to register thereunder, *held* sufficient.

4. **Conspiracy 43(6)—Indictment for conspiracy to violate Espionage Act sufficient.**

    An indictment under Espionage Act, tit. 1, § 4 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212d), for conspiracy to violate section 3 of the act (section 10212c), *held* sufficient.

5. **Indictment and information 99—Following counts may incorporate by reference allegations of first count.**

    Each subsequent count in an indictment may refer to and make part of it allegations contained in the first count.

6. **Indictment and information 125(5½)—Single count may charge conspiracy to commit two offenses.**

    A count in an indictment charging conspiracy to commit two offenses *held* not bad for duplicity.

7. **Criminal law 1092(9)—Jurisdiction to extend time for settling bill of exceptions limited to term or extension given by rule of court.**

    After the expiration of the term at which a judgment was rendered and of any extended time allowed by rule of court for settling a bill of exceptions, the court is without jurisdiction to grant any further extension of time, and such jurisdiction cannot be conferred by consent of counsel.

In Error to the District Court of the United States for the Northern Division of the Northern District of California.

Criminal prosecution by the United States against Edward Ander-

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

269 F.—5    *Certiorari denied 254 U. S. —, 41 Sup. Ct. 447, 65 L. Ed. —.

son and others.   Judgment of conviction, and defendants bring error. Affirmed.

This case is a consolidation of writs of error sued out by the plaintiffs in error from the judgment against them upon a verdict of guilty under four counts of the indictment, the sufficiency of each of which to constitute a crime is challenged by the respective plaintiffs in error. If that contention be well founded, it is, of course, clear that the judgment must be reversed, whether or not we are at liberty to consider the bill of exceptions.

The first count alleges in effect the existence of a state of war between the United States and the Imperial German government, and that in those circumstances the defendants, with other persons therein named and with others to the grand jurors unknown, throughout a certain designated period and within the jurisdiction of the court below, entered into a conspiracy to by force prevent, hinder, and delay the execution of certain specified laws of the United States, all of which laws were enacted in support and furtherance of the said war, and that throughout the said period and theretofore there existed a certain organization of persons under the name of "Industrial Workers of the World, commonly called 'I. W. W.'s,' 'The One Big Union,' and 'O. B. U.'; that said organization during said period has been composed of a large number of persons, to wit, 200,000 persons, distributed in all parts of the United States, being almost exclusively laborers in the many branches of industry necessary to the existence and welfare of the people of the United States and of their government, among others the transportation, mining, meat-packing, canning, lumbering, and farming industries, and the live stock, fruit, vegetables, and cotton-raising industries; that said defendants during said period have been members of said organization, and among those known in said organization as 'Militant Members of the Working Class' and 'Rebels,' holding various offices, employments, and agencies therein; and that in their said membership, office, employments, and agencies said defendants during said period of time, with the special purpose of preventing and hindering and delaying the execution of said laws, severally have been actively engaged in managing and conducting the affairs of said association, propagating its principles by written, printed, and verbal exhortations, and accomplishing its objects, which are now here explained, and thereby and in so doing during said period, throughout the United States and in said division and district, have engaged in and have attempted to accomplish, and in part have accomplished, the objects of the unlawful and felonious conspiracy aforesaid.

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present, that said organization, before and during said period of time, has been one for supposedly advancing the interests of laborers as a class (by members of said organization called 'the workers' and 'the proletariat'), and giving them complete control and ownership of all property, and of the means of producing and distributing property, through the abolition of all other classes of society (by the members of said organization designated as 'capitalists,' the 'capitalistic class,' 'the master class,' 'the ruling class,' 'exploiters of the workers,' 'bourgeois' and 'parasites'), such abolition to be accomplished, not by political action, or with any regard for right or wrong, but by the continual and persistent use and employment of unlawful, tortious, and forcible means and methods, involving threats, assaults, injuries, intimidations, and murders upon the persons, and the injury and destruction (known in said organization as 'sabotage,' 'direct action,' 'working on the job,' 'wearing the wooden shoes,' 'working the saboat,' and 'slowing down tactics') of the property, of such other classes, the forcible resistance to the execution of all laws, and finally the forcible revolutionary overthrow of all existing governmental authority, in the United States, use of which said first-mentioned means and methods was principally to accompany local strikes, industrial strikes, and general strikes of such laborers, and use of all of which said means and methods was to be made in reckless and utter disregard of the rights of all persons not members of said organization, and especially of the right of the United States to execute its above-enumerated laws, and with especial and

particular design on the part of said defendants of seizing the opportunity presented by the desire and necessity of the United States expeditiously and successfully to carry on its said war, and by the consequent necessity for all laborers throughout the United States in said branches of industry to continue at and faithfully to perform their work for putting said unlawful, tortious, and forcible methods for accomplishing said object of said organization into practice, said defendants well knowing, as they have, during said period, well known and intended, that the necessary effect of their so doing would be, as it in fact has been, to hinder and delay and in part to prevent the execution of said laws above enumerated, through interference with the production and manufacture of divers articles, to wit, munitions, ships, fuel, subsistence supplies, clothing, shelter, and equipment required and necessary for the military and naval forces of the United States in carrying on said war, and of the materials necessary for such manufacture, and through interference with the procurement of such articles and materials, by the United States, through purchases, and through orders and contracts for immediate and future delivery thereof, between the United States and persons, firms, and corporations too numerous to be here named (if their names were known to said grand jurors), and through interference with and the prevention of the transportation of such articles and of said military and naval forces; and that said organization, as said defendants during said period of time have well known and intended, has also been one for discouraging, obstructing, and preventing the prosecution by the United States of said war between the United States and the Imperial German government, and preventing, hindering, and delaying the execution of said laws above enumerated, by requiring the members of said organization available for duty in said military and naval forces to fail to register, and to refuse to submit to registration and draft, for service in said naval and military forces, and to fail and refuse to enlist for service therein, and by inciting others so to do, notwithstanding the requirements of said laws in that behalf, and notwithstanding the patriotic duty of such members and others so to register and submit to registration and draft, and so to enlist, for service in said military and naval forces, and notwithstanding the cowardice involved in such failure and refusal, which last-mentioned object of said organization was also to be accomplished by the use of all the means and methods aforesaid as a protest against, and as a forcible means of preventing, hindering, and delaying, the execution of said laws of the United States, as well as by the forcible rescue and concealment of such of said members as should be proceeded against under those laws for such failure and refusal on their part, or sought for service or for enlistment and service in said military and naval forces."

The indictment in its first count then set out a large number of overt acts, publications, and other matters alleged to have been committed, issued, and perpetrated by various ones of the alleged conspirators to effect and carry out the alleged conspiracy, the direct tendency of which was to show the conspiracies alleged, examples only of which acts, publications, and other such matters it is practically possible to set out in an opinion of reasonable length. Thus it was alleged in the first count, among other things, as follows:

"Said defendant William Hood, otherwise called Tim McCarthy, hereinabove named, on or about the 20th day of December, in the year of our Lord 1917, at Smart, in the county of Placer, in the Northern division of the Northern district of California, then and there being, did unlawfully, willfully, knowingly, and feloniously present and cause to be presented to a common carrier for shipment a package containing explosives, to wit, nine sticks of dynamite packed and incased in a wooden box, without having plainly marked on the outside of said package the contents thereof; that is to say: Said defendant, on or about the 20th day of December, in the year of our Lord 1917, at Smart, in the said county, division, district, and state aforesaid, then and there being, did present and cause to be presented to Wells Fargo & Co., a common carrier as aforesaid, for shipment from Smart, in the county of Placer, state of California, a package containing explosives, to wit, nine sticks of dynamite packed and incased in a wooden box consigned to Geo. Messingham, Sacramen-

to, Cal., marked and designated only as follows: 'Handle with care. 1 Box Glassware.' * * * Said defendant William Hood, otherwise called Tim McCarthy, hereinabove named, on or about the 21st day of December, in the year of our Lord 1917, at Smart, in the county of Placer, in the Northern division of the Northern district of California, then and there being, did unlawfully, willfully, knowingly, and feloniously carry upon and in a vehicle controlled and operated by a common carrier engaged in interstate and foreign transportation, exposives, to wit, nine sticks of dynamite, under a false and deceptive marking, description, invoice, and shipping order, and without informing the agent of such common carrier of the .true character thereof at or before the time such carriage was made; that is to say: Said defendant, on or about the 21st day of December, in the year aforesaid, carried from Smart, in the county of Placer, state of California, upon train No. 23, and in a vehicle controlled and operated by the Southern Pacific Company, a common carrier as aforesaid, engaged in interstate and foreign transportation, and running between Goldfield, in the state of Nevada, and San Francisco, in the state of California, explosives, namely, nine sticks of dynamite packed and incased in a wooden box and marked and designated only as follows: 'Handle with care. 1 Box Glassware.'"

The first count also alleged as follows:

"Said defendants heretofore named, in the month of September, 1917, the exact date is to the grand jury unknown, at Sacramento, California, in said division and district, and in other places in the state of California, caused to be circulated a certain newspaper, called and known as 'Solidarity,' of the date of September 1, 1917, which said issue of said newspaper 'Solidarity' contained, among other things, the following:

" 'Preamble.

" 'Industrial Workers of the World.

" 'The working class and the employing class have nothing in common. There can be no peace as long as hunger and want are found among the millions of working people, and the few, who make up the employing class, have all the good things in life.

" 'Between these two classes a struggle must go on until the workers of the world organize as a class, take possession of the earth and the machinery of production, and abolish the wage system.

" 'We find that the centering of management of industries into fewer and fewer hands makes the trade unions unable to cope with the ever-growing power of the employing class. The trade unions foster a state of affairs which allows one set of workers to be pitted against another set of workers in the same industry, thereby helping defeat one another in wage wars. However, the trade unions aid the employing class to mislead the workers into the belief that the working class have interests in common with their employers.

" 'These conditions can be changed and the interest of the working class upheld only by an organization formed in such a way that all its members in any one industry, or in all industries, if necessary, cease work whenever a strike or lockout is considered on in any department thereof, thus making an injury to one an injury to all.

" 'Instead of the conservative motto, "A fair day's wage for a fair day's work," we must inscribe on our banner the revolutionary watchword, "Abolition of the wage system." ·

" 'It is the historic mission of the working class to do away with capitalism. The army of production must be organized, not only for the everyday struggle with capitalists, but also to carry on production when capitalism shall have been overthrown. By organizing industrially we are forming the structure of the new society within the shell of the old.'

"Said defendants heretofore named, in July and August, 1917, the exact date is to the grand jurors unknown, at Sacramento, California, in said division and district, and at other places in the state of California, caused to be circulated a certain newspaper called and known as 'Solidarity,' of the date of July 28, 1917, in which said issue of said newspaper there appeared, among other things, the following matter in print; that is to say:

" 'Were You Drafted?

" 'Where the I. W. W. Stands on the Question of War.

" 'The attitude of the Industrial Workers of the World is well known to the people of the United States and is generally recognized by the labor movement throughout the world.

" 'Since its inception our organization has opposed all national and imperialistic wars. We have proved, beyond the shadow of a doubt, that war is a question with which we never have and never intend to compromise.

" 'Members joining the military forces of any nation have always been expelled from the organization.

" 'The I. W. W. has placed itself on record regarding its opposition to war, and also as being bitterly opposed to having its members forced into the bloody and needless quarrels of the ruling class of different nations.

" 'The principal of the international solidarity of labor to which we have always adhered makes impossible our participation in any and all of the plunder squabbles of the parasite class.

" 'Our songs, our literature, the sentiment of the entire membership—the very spirit of our union, give evidence of our unalterable opposition to both *capitalism* and its wars.

" '*All members of the I. W. W. who have been drafted should mark* their claims for exemption "I. W. W.; opposed to war."

" 'Editor, Solidarity.' "

The first count further alleged as follows:

"Said defendants heretofore named, in the month of May, 1917, the exact date is to the grand jurors unknown, at Sacramento, California, in said division and district, and at other places in the state of California, caused to be circulated a certain newspaper called and known as 'Solidarity,' of the date of May 12, 1917, in which said issue of said newspaper there appeared, among other things, the following matter in print; that is to say:

"On page two, column two thereof:

" 'The Selective Draft.

" 'The selective draft, as outlined by the government at Washington, is the rankest, rawest, crudest piece of work that was ever attempted to be "put over" in the interests of Big Business under the lying mask of "patriotism."

" 'To drag workers against their wills into a war in which they have nothing to gain and to force them to fight with other workers with whom they have no quarrel. To compel them to suffer privation and encounter death, disease and mutilation on the blood-soaked fields of France, or to starve themselves at home in order that the capitalists in this country may amass fortunes by feeding Europe—all this speaks eloquently of the supreme confidence the parasites have in the ignorance and blindness of the American working class. And on top of all, the blood-puddlers of the Oligarchy have the gall to ask the workers to call the class struggle off until after the war. But we will not permit their loot-wrangle to obstruct our work of *organization* for a moment. Our Union is all we have—it is all that stands between us and the greed and tyranny of our industrial overlords—and we do not propose to let our enemies crush it at a time when we need it most.' "

The first count further set out, from subsequent issues of the paper mentioned, the following:

"One thing, however, our enemies are likely to overlook; that is, the power of the aroused membership in action. It is a mistake to think that the I. W. W. is a loosely knit and easily intimidated organization. The banner of the One Big Union is planted in every industry in every state of the Nation. Red card men are shrewd, determined, valorous and loyal to the cause they love. If they are hounded to desperation they will be a hard proposition to handle. There would not be soldiers enough in the country to round them up for arrest, nor jails enough to hold them, once arrested. The I. W. W. is so deeply rooted in America and the world that it can afford to take the chances of an open war a whole lot better than the powers that oppose it. * * * It was

the I. W. W. that first showed the world how to fight effectively against great odds. We have shown the world how to go to jail in huge numbers, exasperate the taxpayers and block the machinery of 'justice.' It was the I. W. W. that developed a system of telling tactics to be used in prison yards and rock piles. The 'slow down' plan and mass opposition to unjust regulations would work as well in detention camps, in jail, or on the job. The widespread knowledge of the effects of punitive sabotage upon modern industry gives the militant portion of the working class the power to stop or disrupt production at will. The membership of the I. W. W. is conscious of its power and knows how to achieve its ends, and is dead game to take whatever measures as necessary in order to do so. The preservation of the One Big Union is essential to the survival of the working class. In fighting for his union the I. W. W. is fighting for himself, and his class. And self-preservation, like the Copper Trust, knows no law. * * *

### "The Rockford Frame-Up.

"One hundred and thirty-eight men are in the jails of Rockford, Freeport and Belvidere, as a result of the nonregistration parade on June 6th. Ten of them are charged with conspiracy. The bonds are set for ten thousand dollars. Eight of these fellow workers are members of the I. W. W. * * *

### "117 Rockford Rebels Sentenced.

### "Year and a Day at Hard Labor for Most of Them—One-Half of Those Sentenced I. W. W.'s.

"The Rockford rebels who refused to register on June 6th and gave themselves up to the authorities of the town of Rockford were given a thorough grilling, a bitter tongue-lashing, and, most of them, extreme sentences by Federal Judge Landis at Freeport, Ill., on July 5th. The prisoners were undisturbed by the diatribes of 'His Honor' and were defiant and uncowed to the end. * * * It is anticipated that we will have conscription here now, in spite of the recent referendum. It may precipitate a revolution and certainly a far-reaching industrial upheaval, and you can bet your socks that we of the wobblies will be in the van, as we were before. The miners are retaliating with the 'Dauge'; that is, limiting the output to less skips a day. That will reduce the general quantity of coal mined by about 35 per cent. The boss will have to burn up his surplus to keep the industry going. The slow-down tactics of the workers are getting the goods in this country, and it is one of the real tangible footholds toward industrial control, the ultimate objective of the Industrial Workers of the World. Less work, more jobs, less unemployed. * * *"

The first count further alleged:

"Said defendant, Albert Fox, otherwise called A. L. Fox, and Frederick Esmond, on or about February 1, 1918, prepared and sent a certain telegram, which said telegram is in the words and figures following, to wit:

"'Western Union Telegram.

"'Received at Forum Building, 1109 Ninth Street, Sacramento, Cal.
"'Always open.

"'98 SF TN 51 2EXA.
"'Mt. San Francisco Calif 113 A Feb 1 1918.

"'Asst. District Attorney Johnson

"'72 Federal Bldg Sacramento Calif

"'Today registering strong remonstrance Preston Gregory Local Officials inhuman treatment I W W Federal Prisoners your custody Sacramento also vigorous denunciation Your personal conduct lying press stories current week arrest Indictments matters indifference humane treatments prisoners profession of decency Federal Officials Imperative copies wire all press your official superiors      Defense Committee Fox, Esmond.
"'1145A'

"Said defendants Albert Fox, otherwise called A. L. Fox, and Frederick Esmond, on or about February 1, 1918, prepared and sent a certain telegram, which said telegram is in the words and figures following, to wit:

" 'Western Union Telegram.

" 'Received at Forum Building, 1109 Ninth Street, Sacramento, Cal.

" 'Always Open.

" '96 SF TN30 1 EXA

" 'Mt. San Francisco Calif 1113A Feb 1 1918

" 'Gormley

" '70 Sheriff Sacramento Calif

" 'Complaining Washington local officials inhuman treatment I W W Federal prisoners Sacramento inquiring scoundrelly theft thirty dollars sent for jail comforts arrests Indictments matters indifference humane treatment prisoners imperative                                                    Fox, Esmond.

" '1140A'

"Said defendants Albert Fox, otherwise called A. L. Fox, and Frederick Esmond, on or about February 1, 1918, prepared and sent a certain telegram, which said telegram is in the words and figures following, to wit:

" 'Western Union Telegram.

" 'Received at Forum Building, 1109 Ninth Street, Sacramento, Cal.

" 'Always Open.

" '97 SF TN

" 'Mt. San Francisco Calif. 1113A Feb 1, 1918

" 'Sacramento Bee

" '71 Sacramento Calif

" 'Strong complaint Washington local officials inhuman treatment I W W Federal prisoners Sacramento inquiring scoundrelly theft thirty dollars sent for Jail comforts   Indictments arrests matters indifference humane treatment prisoners imperative resent worse than Ruhleben.                Fox, Esmond.

" '1141A.' "

The second count alleged in substance that the defendants named in the first count, throughout the period of time from April 6, 1917, to the finding of the indictment, at the city of Sacramento, unlawfully and feloniously conspired together and with certain other named parties, and with other persons to the grand jurors unknown, to injure, oppress, threaten, and intimidate a great number of citizens of the United States, the names and number of whom are to the grand jurors unknown, but who only can be and are by the grand jurors designated as the class of persons mentioned in the first count of the indictment, who in the free exercise and enjoyment by them, respectively, of their right and privilege, have been, during the period specified, furnishing and endeavoring to furnish to the United States, "in pursuance of sales. orders, and contracts between them and the United States, munitions, ships, fuel, subsistence supplies, clothing, shelter, and equipment, necessary for the military and naval forces of the United States in carrying on its war with the Imperial German government in said first count referred to, material necessary for the manufacture of those articles, and transportation of said articles and materials, and of said military and naval forces, all required and authorized to be procured by the United States from such persons and citizens under the several laws of the United States specifically mentioned in said first count as being the laws of which said defendants are charged in said count with conspiring to prevent, hinder, and delay the execution; that is to say, the right and privilege of furnishing, to said United States, without interference, hindrance, or obstruction by others, said articles, materials, and transportation which said conspiracy in this count mentioned has been one for injuring, oppressing, threatening, and intimidating said citizens, by interfering with, hindering, and obstructing them in the free exercise and enjoyment of said right and privilege, by and through the continued and persistent use and employment, by said defendants under the circumstances and conditions in said first count described, of the unlawful and tortious means and methods in that count set forth as the means and methods of accomplishing the objects of the unlawful and felonious conspiracy in that count charged against said defendants, the allegations of which said count in that behalf, and concerning the existence, character and objects of the organization called

'Industrial Workers of the World' and 'I. W. W.'s,' in said count mentioned, concerning the membership offices, employment, and agencies of said defendants in that organization, and concerning said unlawful and tortious means and methods, are incorporated in this count of this indictment by reference to said first count as fully as if they were here repeated."

The third count alleged in substance that, throughout the period of time from May 18, 1917, to the finding of the .indictment, at the city of Sacramento, the defendants named in the first count, then being members of the organization therein described, unlawfully and feloniously conspired together and with certain other named parties, and with other persons to the grand jurors unknown, "to commit divers, to wit, ten thousand, offenses against the United States; that is to. say, ten thousand offenses each to consist in unlawfully aiding, abetting, counseling, commanding, inducing, and procuring one of the' ten thousand male persons other members of said organization, who on June 5, 1917, respectively attained their twenty-first birthday, and who did not on that day attain their thirty-first birthday, and who have been required by the proclamation of the President of the United States dated May 18, 1917, to present themselves for and submit to registration, under the act of Congress approved May 18, 1917 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k], and entitled 'An act to authorize the President to increase temporarily the Military Establishment of the United States,' at the divers registration places in the divers precincts in said Northern division of the Northern district of California, and in the divers other precincts in other states of the United States, wherein said persons have by law respectively been required to present themselves for and submit to such registration, whose names, and the designation of which said precincts, are to said grand jurors unknown, unlawfully and willfully to fail and refuse so to present himself for registration and so to submit thereto; none of such persons being an officer or an enlisted man of the Regular Army, of the Navy, of the Marine Corps, or of the National Guard or Naval Militia in the service of the United States, or an officer in the Reserve Corps, or an enlisted man in the Enlisted Reserve Corps in active service, and divers, to wit, five thousand, other offenses against the United States, that is to say, five thousand offenses each to consist in unlawfully and feloniously aiding, abetting, counseling, commanding, inducing, and procuring one of the five thousand persons, still other members of said organization, who should become subject to the military law of the United States under and through the enforcement of the provisions of the act of Congress in this count of this indictment above mentioned, and of the proclamation, rules, and regulations of the President of the United States made in pursuance of said act of Congress, and whose names are also unknown to said grand jurors, unlawfully and feloniously to desert the service of the United States in time of war; said defendants not then being themselves subject to military law of the United States. And the grand jurors aforesaid, upon their oaths aforesaid, do further present that in and for executing said unlawful and felonious conspiracy, combination, confederation, and agreement in this count of this indictment charged, certain of said defendants, at the several times and places in that behalf mentioned in connection with their names under the heading 'Overt Acts' in the first count of this indictment, having done certain acts; that is to say, the several acts mentioned in said first count under said heading."

The fourth count alleged that, throughout the period of time from June 15, 1917, to the finding of the indictment, the defendants named in the first count, at the city of Sacramento, unlawfully and feloniously conspired together and with certain other. named persons, and with others to the grand jurors unknown, "to commit a certain offense against the United States, to wit, the offense of unlawfully, feloniously, and willfully causing and attempting. to cause insubordination, disloyalty, and refusal of duty in the military and naval forces of the United States, when the United States was at war; and this through and by means of personal solicitation, of public speeches, of articles printed in certain newspapers called 'Solidarity,' 'Industrial Worker,' 'A Bermunkas,' 'Il Proletario,' 'Industrial Unionist,' 'Rabochy,' 'El Rebelde,' 'Alarm,' and 'Australian Administration' circulating throughout the United States,

and of the public distribution of certain pamphlets entitled 'War and the Workers,' 'Patriotism and the Workers,' and 'Preamble and Constitution of the Industrial Workers of the World,' and same being solicitations, speeches, articles, and pamphlets persistently urging insubordination, disloyalty, and refusal of duty in said military and naval forces and failure and refusal on the part of available persons to enlist therein, and another offense against the United States, to wit, the offense of unlawfully, feloniously, and willfully, by and through means last aforesaid, obstructing the recruiting and enlistment service of the United States when the United States was at war, to the injury of that service and of the United States. And the grand jurors aforesaid, upon their oaths aforesaid, do further present that, in and for executing said unlawful and felonious conspiracy, combination, confederation and agreement in this count of this indictment charged, certain of said defendants, at the several times and places in that behalf mentioned in connection with their names under the heading 'Overt Acts' in the first count of this indictment, have done certain acts; that is to say, the several acts mentioned in said first count under said heading."

Otto Christensen, of Chicago, Ill., for plaintiffs in error.

Frank M. Silva, U. S. Atty., and Albert M. Hardie, Jr., and E. M. Leonard, Asst. U. S. Attys., all of San Francisco, Cal.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] The first count of the indictment was based on section 6 of the federal Penal Code (Comp. St. § 10170), which provides as follows:

"If two or more persons in any state or territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof"

—shall be punished in a prescribed way.

[2] The second count was based on section 19 of the same Code (section 10183), which declares:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured"

—shall be punished in a prescribed way.

[3] The third count charges a conspiracy under section 37 of the same Code (section 10201) to violate section 332 thereof (section 10506), and section 5 of the Act of May 18, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 2044e), commonly known as the Selective Service Act.

Section 37 of the Code, so far as necessary to be stated, is as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be"

—punished in a prescribed way; and section 332 of the same Code so referred to declares that:

"Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission is a principal."

Section 5 of the Selective Service Act provides:

"That all male persons between the ages of twenty-one and thirty, both inclusive, shall be subject to registration in accordance with regulations to be prescribed by the President; and upon proclamation by the President or other public notice given by him or by his direction stating the time and place of such registration it shall be the duty of all persons of the designated ages, except officers and enlisted men of the Regular Army, the Navy, and the National Guard and Naval Militia while in the service of the United States, to present themselves for and submit to registration under the provisions of this act; and every such person shall be deemed to have notice of the requirements of this act upon the publication of said proclamation or other notice as aforesaid given by the President or by his direction; and any person who shall willfully fail or refuse to present himself for registration or to submit thereto as herein provided, shall be guilty of a misdemeanor and shall, upon conviction in the District Court of the United States having jurisdiction thereof, be punished"

—in a prescribed way.

[4] The fourth count charges a conspiracy under section 4, tit. 1, of the Espionage Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10212d) to violate section 3 thereof (section 10212c). Section 4 of that act, so far as necessary to be stated, is as follows:

"If two or more persons conspire to violate the provisions of section 2 or 3 of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy."

And section 3 of the Espionage Act, thus referred to, so far as necessary to be stated, reads as follows:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States, or to promote the success of its enemies, * * * and whoever, when the United States is at war, shall willfully cause, or attempt to cause * * * insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct * * * the recruiting or enlistment service of the United States"

—to the injury of the service of the United States shall be punished in a prescribed way.

Having clearly in view the decisions of the Supreme Court in the cases of United States v. Cruikshank et al., 92 U. S. 542, 23 L. Ed. 588, and Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 30 L. Ed. 766, so much relied on by counsel for the plaintiffs in error, we have no doubt of the sufficiency of each count of the indictment upon which the judgment of conviction was based.

[5] It is well settled law that each subsequent count may refer to and make a part of it allegations contained in the first count. Blitz v. United States, 153 U. S. 308, 14 Sup. Ct. 924, 38 L. Ed. 725; Crain

v. United States, 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097; Glass v. United States, 222 Fed. 773, 138 C. C. A. 321.

Counsel for the plaintiffs in error rely particularly upon the decision of the Supreme Court in Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 30 L. Ed. 766—saying in their brief:

"That case is so similar to the one at bar in the facts presented, and the opinion of the court is so pat that it leaves nothing for us to say, even by way of applying the principles involved."

We think the cases, both in fact and in principle, entirely different. In Baldwin v. Franks, Baldwin was held on a charge of conspiracy with one Wilson and others to deprive certain Chinamen belonging to—

"a class of Chinese aliens, being * * * subjects of the emperor of China, of the equal protection of the laws and of equal privileges and immunities under the laws, for that said * * * persons so belonging to the class of Chinese aliens did then * * * reside at the town of Nicolaus, in said county of Sutter, in said state of California, and were engaged in legitimate business and labor to earn a living, as they had a right to do, and they at that time had a right to reside at said town of Nicolaus, * * * and engage in legitimate business and labor to earn a living, under and by virtue of the treaties existing, and which did then exist, between the government of the United States and the emperor of China, and the Constitution and laws of the United States; but nevertheless, while said * * * persons were * * * so residing and pursuing their legitimate business and labor for the purpose aforesaid, said conspirators * * * did, * * * having conspired together for that purpose, unlawfully and with force and arms, violently and with intimidation, drive and expel said persons, * * * belonging to said class of Chinese, * * * from their residence at said town of Nicolaus, * * * and did * *. * deprive them * * * of the privilege of conducting their legitimate business and of the privilege of laboring to earn a living, and, without any legal process, * * * placed said Chinese aliens * * * under unlawful restraint and arrest, and so detained them for several hours, and * * * by force and arms, and with violence and intimidation, placed them * * * upon a steamboat barge, then plying on the Feather river, and drove them from their residence and labor and from said county."

Baldwin was not charged with a conspiracy to overthrow the government, or with hindering or delaying the United States in the execution of any measures for the protection of the Chinese, or with in any way interfering with the exercise by the government of its authority, but, on the contrary, the conspiracy into which he entered was directed and exerted against the Chinese people themselves; the Supreme Court saying (120 U. S. at page 693, 7 Sup. Ct. at page 663, 30 L. Ed. 766):

"It cannot be claimed that Baldwin has been charged with a conspiracy to overthrow the government or to levy war, within the meaning of this section. Nor is he charged with any attempt to seize the property of the United States. All, therefore, depends on that part of the section which provides a punishment for 'opposing' by force the authority of the United States, or for preventing, hindering, or delaying the 'execution' of any law of the United States. This evidently implies force against the government as a government. To constitute an offense under the first clause, the authority of the government must be opposed; that is to say, force must be brought to resist some positive assertion of authority by the government. A mere violation of law is not enough; there must be an attempt to prevent the actual exercise of

authority. That is not pretended in this case. The force was exerted in opposition to a class of persons who had the right to look to the government for protection against such wrongs, not in opposition to the government while actually engaged in an attempt to afford that protection.

"So, too, as to the second clause, the offense consists in preventing, hindering, or delaying the government of the United States in the execution of its laws. This, as well as the other, means something more than setting the laws themselves at defiance. There must be a forcible resistance of the authority of the United States while endeavoring to carry the laws into execution. The United States are bound by their treaty with China to exert their power to devise measures to secure the subjects of that government lawfully residing within the territory of the United States against ill treatment, and if in their efforts to carry the treaty into effect they had been forcibly opposed by persons who had conspired for that purpose, a state of things contemplated by the statute would have arisen. But that is not what Baldwin has done. His conspiracy is for the ill treatment itself, and not for hindering or delaying the United States in the execution of their measures to prevent it. His force was exerted against the Chinese people, and not against the government in its efforts to protect them. We are compelled, therefore, to answer the third subdivision of the seventh question in the negative, and that covers the fourth subdivision."

[6] No impartial person can, in our opinion, read the counts of the indictment in the present case without seeing that the offense specified in each of them is a conspiracy aimed at the government itself, by hindering, delaying, and preventing the execution of laws it had enacted in the prosecution of the war in which it was at the time engaged. The highly criminal character of the means alleged to have been resorted to by the alleged conspirators is so plain as to require no comment. Nor do we see anything duplicitous about any of the counts of the indictment. Responding to a like objection made in the case of Frohwerk v. United States, 249 U. S. 204, 209, 39 Sup. Ct. 249–252 (63 L. Ed. 561), the Supreme Court said:

"Countenance we believe has been given by some courts to the notion that a single count in an indictment for conspiring to commit two offenses is bad for duplicity. This court has given it none. Buckeye Powder Co. v. Du Pont Powder Co., 248 U. S. 55, 60, 61; Joplin Mercantile Co. v. United States, 236 U. S. 531, 548. The conspiracy is the crime, and that is one, however diverse its objects."

See, also, Magon et al. v. United States, decided by this court and reported in 260 Fed. 811, 171 C. C. A. 537.

[7] The verdict of the jury was rendered January 16, 1919, finding each and all of the defendants guilty, and on the next day, January 17th, judgment against all of them, except Fox, Saffores, and Pollok, was entered. The three defendants last named entered a motion for a new trial, after which the case was, with the consent of the government, "continued to a later date for hearing of said motion." The court thereupon, and after hearing the attorneys of the respective parties, entered an order transferring the case as against the defendants Fox, Saffores, and Pollok to the Southern Division of the court "for all further proceedings," and subsequently, after hearing the attorney for those defendants—the attorney for the United States being present—denied the motion for a new trial and postponed the pronouncing of judgment against them until June 18, 1919, on which day such judg-

ment was rendered. Neither of the defendants Saffores nor Pollok having sued out a writ of error, no further reference to them need be made, except incidentally.

The term of the court for the Northern Division of the District expired April 13, 1919. Rule 9 of the Rules of Practice of the court applicable to both divisions of it, provides as follows:

"For the purpose of making and filing a bill of exceptions and of making any and all motions necessary to be made within the term at which any judgment or decree is entered, each term of this court. shall be and hereby is extended so as to comprise a period of three calendar months beginning on the first Tuesday of the month in which verdict is rendered or decree entered."

The time thus fixed by the rule of the court expired in this instance prior to the termination of the term of the court, which was, as has been stated, April 13th. The record shows that four days after the expiration of the term during which the verdict was rendered and the judgment entered against all of the defendants except Fox, Saffores, and Pollok, that is to say, April 17, 1919, one of the Circuit Judges made this order in the case:

"It is hereby ordered that the time for preparing and serving bill of exceptions, on behalf of all of the defendants in the above-entitled action against whom judgment has been pronounced, be and the same is hereby extended to June 15, 1919."

The record further shows that on the 10th day of June, 1919, Judge Rudkin, before whom the case was tried, made this order:

"It is ordered that the time for proposing and filing a bill of exceptions in the above-entitled cause (United States of America v. Elmer Anderson et al.), except as to the defendants Saffores, Fox, and Pollok, is hereby extended to and including the 25th day of July, 1919."

The record does not show that the United States attorney consented to or had notice of the making of either of those orders, and in the brief on the part of the government it is asserted that its attorney had no notice of the application for them.

On the 18th day of July, 1919, Judge Hunt made this order:

"For satisfactory reasons appearing to the Honorable William H. Hunt, Judge, and by stipulation between respective counsel, it is hereby ordered that the time for the signing and sealing of bill of exceptions herein, as the same may be settled and signed, be and the same is hereby extended for 60 days after date hereof, and that, whenever so settled and signed, the said bill of exceptions herein shall stand as settled, signed, and filed, and made a part of the record herein as of the 7th day of April, 1919, which 7th day of April, 1919, is within the time originally allowed by the court for the presenting, signing, and filing of said bill of exceptions herein; and the United States shall have 60 days after service of the bill of exceptions in which to submit amendments."

The record further shows that on the 3d day of October, 1919, Judge Van Fleet made and entered this order in the cause entitled United States v. A. L. Fox:

"It is hereby ordered that plaintiff may have, and it is hereby given, to and including the 23d day of October, 1919, within which to prepare, serve, and file its proposed amendments to defendant's proposed bill of exceptions on writ of error to the Circuit Court of Appeals of the United States for the Ninth Judicial Circuit, in the above-entitled case.

"It is understood that the granting of this order shall in no wise constitute a waiver of or prejudice the right of the plaintiff to make or file any motion or motions to strike from the files the said bill of exceptions upon the ground that the same was not served within the time allowed by the rules of practice of this court, or upon any other grounds.

"Dated October 3, 1919:

"Wm. C. Van Fleet, United States District Judge."

Thereafter, and on October 23, 1919, Judge Morrow made and entered in the same case this order:

"It is hereby ordered that plaintiff may have, and it is hereby given, to and including the 2d day of November, 1919, within which to prepare, serve, and file its proposed amendments to defendant's proposed bill of exceptions on writ of error to the Circuit Court of Appeals of the United States for the Ninth Judicial Circuit, in the above-entitled case.

"It is understood that the granting of this order shall in no wise constitute a waiver or prejudice the right of plaintiff to make or file any motion or motions to strike from the files the said proposed bill of exceptions upon tne ground that the same was not served within the time allowed by the rules of practice of this court, or upon any other grounds.

"Dated October 23, 1919.                    Wm. W. Morrow,

"Judge United States Circuit Court of Appeals, Ninth Judicial Circuit."

October 31, 1919, the attorney for the government filed in the Northern Division of the court, in the case entitled United States of America against all of the defendants except Fox, Saffores, and Pollok, and on the next day filed in the Southern Division of the court, in the case entitled United States against Fox, motions to strike from the files the proposed bill of exceptions, upon the grounds, in effect, that such bill was neither served nor filed within the time allowed by the rules of the court or by the law. The motions were based upon the records, as well as upon the affidavits on behalf of the respective parties, and resulted in a denial thereof by this order, made by Circuit Judge Hunt February 24, 1920:

"Upon reading the affidavits and hearing statements of counsel, it is proper to say that my own independent recollection of the circumstances connected with the order extending time for sealing and signing of the proposed bill of exceptions in the above-entitled case is not perfectly clear, but as I recall the matter it occurred as follows:

"As I had not presided at the trial of the case, and knew nothing in detail of the record, I was specially careful to advise Mr. Christiansen that I would grant no order of any kind in the case until he had seen and conferred with the United States district attorney. Subsequently Mr. Geis, Assistant United States Attorney, and Mr. Christiansen, came to my chambers and after some colloquy with respect to the proposed order and the period of time within which counsel for the United States might present any proposed amendments to the bill of exceptions, it was agreed between counsel that the order as signed by me was proper. In the presence of counsel I therefore inserted in my handwriting the words which appear in my handwriting in the original order, and in presence of counsel I signed the order and delivered it to them or to one of them.

"I am strengthened in my recollection by the fact that my practice is not to sign such orders until counsel for both sides have personally presented their views, and I am positive that the inserted words in my handwriting could only have been written by me upon the clear understanding on my part that they recorded the fact as stated.

"I must therefore deny the motion.

"Feb. 17, 1920.                              Wm. H. Hunt, Judge."

We therefore take it, as a matter of course, that the order made by Judge Hunt July 18, 1919, and hereinbefore set out, was made "by stipulation between respective counsel." The question, however, remains: Were either of the orders so made of any validity?

As to all of the plaintiffs in error except Fox, we think it clear that we are precluded from considering the bill of exceptions as a part of the record, for the reason that the term of the court during which both the verdict and judgment against them were rendered had expired prior to the signing of either of the orders undertaking to extend the time for the preparation, service, or settling of such bill. In support of this conclusion we need to do no more than refer to the very recent decision of the Supreme Court in O'Connell et al. v. United States, 253 U. S. 142, 40 Sup. Ct. 444, 64 L. Ed. 827 (Advance Sheets, May 17, 1920). In that case the trial in the lower court took place during its July term, 1917, and continued from September 12th to September 25th. The next statutory term of the court began November 15th. September 29th the defendants to the action, against whom a verdict of guilty was rendered, were granted 30 days for preparation and presentation of a bill of exceptions. October 23d an order undertook to extend the time to November 15th; on November 12th a like order specified November 27th; on November 26th an order specified December 15th; on December 14th a further order undertook to extend it to December 24th, when a still further extension was ordered to December 31st. On the latter date a proposed bill was presented. January 9, 1918, the United States attorney procured an order granting time in which to prepare amendments to the proposed bill which were thereafter presented. The Supreme Court said:

"Under the statute the trial term expired November 15th; but, for the purpose of filing the bill of exceptions, a general rule extended it to December 4th—three months from the first Tuesday in September. The last order of court within the extended term designated December 14th as the final day for action"

—and held that the power of the trial court over the case expired not later than the 14th of December, 1917, and that all the proceedings concerning the settlement of the bill, therefore, were coram non judice.

Applying that decision to the facts of the present case, we think it impossible to hold that the court below had any jurisdiction to settle the bill of exceptions in question. As has been seen, the term of the court at which the case was tried expired April 13, 1919; and the rule of the court allowing three months for the preparation and settlement of such bill of exceptions expired the 7th of the same month. It was not until April 17, 1919, that the first of the orders undertaking to extend the time for the preparation and settlement of a bill of exceptions was made. But at that time the power of the trial court over the case as to all of the defendants as to whom it had not been transferred to the Southern Division of the District had expired, according to the express decision of the Supreme Court in O'Connell et al. v. United States, supra, and all proceedings subsequently undertaken, including the contested consent, were therefore coram non judice.

It is entirely true that the consent of the opposite party, given during

the term or any extension thereof, is as efficacious to extend the time for the preparation and settlement of such a bill as an order of the court or judge; but surely no such consent can at any time have any greater power in the matter than such an order. To so hold would, in effect, be to hold that consent can give jurisdiction to the judge, where, by law, his jurisdiction has expired. And so we find the Supreme Court declaring in the case of Waldron v. Waldron, 156 U. S. 361, 378, 15 Sup. Ct. 383, 387 (39 L. Ed. 453):

"The signing of the bill of exceptions after the expiration of the term in which the judgment was rendered, was lawful if done by consent of parties *given during that term.*" (Italics ours.)

Respecting the plaintiff in error Fox—the judgment against whom sentenced him to six months' imprisonment in the county jail of the city and county of San Francisco, almost all of which he served before being admitted to bail pending the determination of his writ of error —it appears that that judgment was rendered June 18, 1919, during the March term of the Southern Division of the court, to which the case against him had been theretofore transferred. No order extending the latter's time within which to prepare or serve a bill of exceptions appears ever to have been made; that of July 18, 1919, having been made in behalf of the defendants in the case remaining pending in the Northern Division of the district, and not embracing the parties as to whom the case had been transferred to the Southern Division of the court. The March term of the latter division expired with the second Monday of July, 1919, and the three months' extension of the term, commencing to run, as it did, the first Tuesday in June of that year, expired September 3, 1919, 20 days previous to the time any bill of exceptions was ever delivered to the attorney for the government.

The judgments are affirmed.